IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA (Muskogee)

RITA CRAMPTON, Personal Representative of the Estate of Jane Ann Martin, deceased,

*Plaintiff,*

vs.

CHRIS MORRIS, *et al.*,

*Defendants.*

Case No. 21-CV-053-JFH

**MEMORANDUM AND ORDER**

Plaintiff Rita Crampton, as personal representative of the estate of Jane Ann Martin, deceased, brings suit against Defendant Chris Morris, Sheriff of Pittsburg County, Oklahoma; Aboutanaa El Habti, Warden of Mabel Bassett Correctional Facility ("MBCC"); and Does I through X, unknown employees of the Pittsburg County Sheriff's Office ("PCSO") or the Oklahoma Department of Corrections ("ODOC"). She brings claims against all Defendants under 42 U.S.C. § 1983 for cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. She brings a supervisory liability claim against Morris and El Habti, and a municipal liability claim against Morris.

Defendant El Habti has filed a Motion to Dismiss (Doc. 25) asserting that Plaintiff fails to state a claim against him. He contends that any official capacity claims against him are barred due to Eleventh Amendment immunity. He also asserts that Plaintiff fails to adequately allege a § 1983

supervisory liability claim against him in his individual capacity. Finally, he contends that he is entitled to qualified immunity. For the reasons stated in more detail below, the Court grants Defendant El Habti's motion.[1]

### I.     Factual and Procedural Background

On November 5, 2019, Martin was taken into custody for parole violations. She was sentenced to six months in the custody of ODOC. She was scheduled to serve her time with ODOC in MBCC in McCloud, Oklahoma. She was taken to Pittsburg County Jail, at approximately 4:52 p.m. on November 5, to be later transferred to MBCC.

Immediately prior to and upon her admission into the Pittsburg County Jail, Martin began complaining of pain in her side, difficulty breathing, elevated fever, and a general feeling of extreme sickness. Martin also had "track mark" scarring on her arms from prior intravenous drug use. Throughout her time at Pittsburg County Jail, Martin repeatedly notified jail staff and other inmates of the excruciating chest pain, difficulty breathing, fever, and flu-like symptoms she was experiencing. After jail staff failed and/or refused to provide Martin with medical treatment, she contacted her friends and family to ask for help. On November 13, 2019, Martin called her father and told him about her chest pains and difficulty breathing. She informed her father that she felt like she was having a pulmonary embolism, and that Pittsburg County Jail employees refused to refer her to see a doctor.

During Martin's time at Pittsburg County Jail, she notified Defendants and Defendants had knowledge of her serious medical condition and needs. No plan was entered to monitor Martin's

---

[1] El Habti also filed a Motion for Stay of Deadlines (Doc. 33) requesting that the Court stay deadlines until the Court issues its ruling on his motion to dismiss. Plaintiff objected to this motion. This Court was referred both motions in May 2022 and considered the pending motions in tandem. El Habti's motion to stay will be denied as moot due to the ruling on the motion to dismiss.

symptoms, no diagnostic testing was performed, and no medical doctor was consulted about her condition. Martin was at the Pittsburg County Jail for eight days before being transported to MBCC on November 14, 2019.

Martin arrived at MBCC around 9:50 a.m. At approximately 10:00 a.m., Officer Tabitha Lane conducted a visual body search where Lane observed Martin having difficulty breathing. When Lane asked Martin about her breathing problems, Martin informed her that she had been having health problems at Pittsburg County Jail but was not provided medical treatment. Lane advised Nurse Kathryn Burton of Martin's breathing difficulties.

At approximately 11:00 a.m., Burton observed Martin, and Martin informed Burton that she was experiencing flu-like symptoms. Burton observed that Martin was breathing very fast. Martin told Burton about her numerous requests to see a doctor while incarcerated at Pittsburg County Jail. At approximately 11:30 a.m., Carrie Hinesly, a MBCC staff member escorted Martin to a dental exam. Martin told Hinesly that she was going to vomit, and Martin appeared to be losing her balance. Hinesly advised Burton of Martin's illness and reported that Martin was being "so dramatic."

During intake, T. Polk, LPN, observed track marks on Martin's arms. Based on the intake medical and visual screening, Plaintiff contends that Martin should have been referred immediately to a physician. MBCC personnel placed Martin in a general population pod with no medical treatment or assessment plan.

At approximately 12:30 p.m., Burton observed Martin shivering in her cell with a blanket over her head. Burton informed Nurse Practitioner Karen Barnor about Martin's severe signs and symptoms. At approximately 12:50 p.m., Burton took Martin's temperature, and Martin was running a fever. Barnor took Martin's vitals around 1:20 p.m. and noted her vital signs were

"extremely elevated." Barnor ordered clonidine for elevated blood pressure, Tylenol for elevated temperature, and an IV for her elevated heart rate. They placed Martin in the medical unit for observation and monitoring.

At approximately 3:15 p.m., as Martin's condition continued to decline and she had extreme difficulty breathing, Barnor ordered an ambulance to transport Martin to the emergency room. At approximately 3:30 p.m., Martin was taken to an infirmary cell because she was having difficulty breathing. Martin continued to struggle with her breathing after receiving oxygen. The ODOC nursing staff reported that Martin appeared diaphoretic, pale, lethargic, and clammy.

Paramedics arrived at MBCC and immediately began performing CPR on Martin. The paramedics left with Martin for the ER at approximately 4:25 p.m. At 7:02 p.m., Martin was pronounced dead by St. Anthony Hospital's physicians. It was later determined that Martin died of right coronary artery ostium occlusion, due to vegetations of the aortic valve, due to chronic bacterial endocarditis.

Infective endocarditis is a life-threatening, but treatable, infection of the heart. It is also a well-known complication of intravenous drug use because needles often provide the infection. Signs and symptoms can include fever, new or changed heart murmur, flu-like symptoms, rapid heart rate, weight loss, and chest pain.

On February 22, 2021, Plaintiff, on behalf of Martin's estate, filed suit against unknown employees of PCSO or ODOC, Sheriff Morris of Pittsburg County, and Warden El Habti of MBCC. Plaintiff's first claim is brought under 42 U.S.C. § 1983, and she alleges that Defendants knew that Martin had serious medical needs and disregarded the known, obvious, and substantial risks to her health and safety. She contends that these acts and/or omissions of indifference were

in violation of the Eighth and Fourteenth Amendments for protection from the infliction of cruel and unusual punishment.

Plaintiff's second claim is against Defendants Morris and El Habti. With regard to El Habti, she asserts that Martin was wrongfully, unlawfully, and unnecessarily denied timely medical care and treatment at MBCC due to inadequate and indifferent training to emergent medical conditions, like infective endocarditis. She asserts that El Habti promulgated, created, implemented, and maintained the policies/practices. In addition, she contends that El Habti knew that his policies, practices, or customs posed substantial risk to the health and safety of inmates like Martin and failed to take reasonable steps to alleviate the risk.[2]

Defendant El Habti has filed a Motion to Dismiss. He asserts that he is immune from suit under the Eleventh Amendment for any claim against him in his official capacity. He also asserts that Plaintiff fails to adequately plead a § 1983 supervisory liability claim against him in his individual capacity. Finally, he contends that he is entitled to qualified immunity.

## II.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] The Court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.' "[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the

---

[2] Plaintiff's third claim is only brought against Morris and asserts a claim for municipal or "*Monell*" liability. As only Defendant El Habti's motion to dismiss is before the Court, the Court will not address this claim.

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Court to reasonably infer that the defendant is liable for the alleged misconduct.[5] Under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[6] Viewing the complaint in this manner, the Court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[7] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' "[8]

### III.   Analysis

Defendant El Habti first asserts that he is immune from suit under the Eleventh Amendment for any claim against him in his official capacity. Plaintiff concedes that Defendant, in his official capacity, is immune from suit. Thus, the Court will only address the individual capacity claim.

El Habti asserts that Plaintiff fails to adequately plead a § 1983 supervisory liability claim against him in his individual capacity. Under § 1983, supervisory liability may not be based upon a theory of respondeat superior.[9] Instead, "[t]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities are: (1) personal involvement, (2) causation, and (3) state of mind."[10]

---

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6] *Id*. at 678–79.

[7] *See id.* at 678.

[8] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

[9] *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

[10] *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (alterations, quotation marks, and citations omitted).

The first element of personal involvement may be met if "the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy" that caused the deprivation of constitutional rights.[11]  Because § 1983 imposes "personal liability on government officials," the court must pay "careful attention to particulars, especially in lawsuits involving multiple defendants."[12]  It is necessary for a plaintiff "to 'identify *specific* actions taken by *particular* defendants' " to adequately allege a viable § 1983 claim.[13]  "It is particularly important that plaintiffs make clear exactly *who* is alleged to have done *what* to *whom*, as distinguished from collective allegations."[14]  "The same particularized approach applies with full force when a plaintiff proceeds under a theory of supervisory liability."[15]  "A plaintiff must therefore identify the specific policies over which particular defendants possessed responsibility and that led to the alleged constitutional violation."[16]

In this case, since there are no allegations that El Habti was personally involved, the allegations must be "predicated on [El Habti] maintaining a policy or custom that resulted in the underlying violation."[17]  Plaintiff includes allegations that the following policies, practices and/or customs existed: (1) understaffing (i.e., no access to an on-site physician); (2) severe limitation of the use of off-site medical and diagnostic service providers, even in emergent situations; (3)

---

[11] *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

[12] *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013).

[13] *Id.* at 1226 (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998)).

[14] *Id.* at 1225 (quotation marks, alterations, and citations omitted).

[15] *Id.* at 1226.

[16] *Id.*

[17] *Burke*, 935 F.3d at 999.

refusing to send inmates with emergent needs to the hospital for purely financial purposes; (4) untimely medical examinations and treatment; (5) inadequate training (i.e., training and encouraging medical personnel and detention staff to assume that inmates are faking illness/injury or malingering); (6) maintaining job duties that require jailers to report emergent medical conditions in the absence of training to identify emergent conditions; (7) adopting a chain of command that lacked supervision; and (8) utterly inadequate medical supervision of staff and inmates.

Yet, these policies and procedures are all general in nature. Furthermore, these policy and procedure allegations are stated in the collective because they are directed at both Pittsburg County Jail and MBCC. Plaintiff alleges that both facilities have the same policies/procedures in place. Plaintiff alleges that the staff's deliberate indifference at both Pittsburg County Jail and MBCC was due to policies or procedures that Sheriff Morris or Warden El Habti created or possessed responsibility for. Yet, there are no specific allegations as to what policies or procedures El Habti promulgated, created, or maintained. There are no specific allegations as to what policies or procedures El Habti was or is responsible for. The allegations amount to nothing more than legal conclusions and generalized assertions. As noted above, this type of pleading is insufficient because of the lack of particulars and specifics.

Even if the Court found that Plaintiff adequately alleged that El Habti maintained or created the policies, a plaintiff must also allege causation to adequately allege a § 1983 supervisory claim. "The second element 'requires the plaintiff to show that the defendant's alleged action(s) caused the constitutional violation' by setting 'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional

rights."[18]  Here, there are no such allegations.  As noted above, Plaintiff only alleges broad and general policies.  Plaintiff alleges that a policy of inadequate and indifferent training to emergent medical conditions contributed to the delay and denial of medical treatment for Martin.  Yet, Plaintiff's specific factual allegations of what occurred in MBCC demonstrate timely medical treatment was given.

Finally, to adequately plead supervisory liability, the plaintiff must allege "that each defendant acted with the requisite state of mind."[19]  A claim under § 1983 for an Eighth Amendment violation based upon a failure to provide medical care is premised on "deliberate indifference to serious medical needs."[20]  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[21]  Deliberate indifference "includes both an objective and a subjective component."[22] Under the objective prong, "a medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' "[23]  Under the subjective prong, "the official

---

[18] *Estate of Booker*, 745 F.3d at 435 (quoting *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013)).

[19] *Pahls*, 718 F.3d at 1226.

[20] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192 (10th Cir. 2014).

[21] *Bd. of Cnty. Comm'rs v. Brown of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

[22] *Al-Turki*, 762 F.3d at 1192 (citation omitted).

[23] *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*"[24]

Here, there are no specific allegations as to El Habti's state of mind. Although Plaintiff broadly alleges that "defendants" knew (either actually or constructively) of Martin's health issues or medical needs, as noted above, there needs to be specific allegations related to particular defendants. "Allegations of 'knowledge' and 'acquiescence' are insufficient to support a finding of personal participation and potential supervisory liability, even if some or all of the underlying practices were constitutional violations."[25] There are no allegations that El Habti knew of Martin's health condition upon arrival to MBCC or during the six hours she was at MBCC. There are no allegations that El Habti knew that there was a risk of substantial harm to Martin. There are no allegations that El Habti knew that Martin was not being monitored or referred to outside medical services. There are no allegations that El Habti directed, had knowledge of, or acquiesced in the jail staff and medical personnel's decision to monitor and treat Martin before calling emergency services to MBCC.[26] In sum, there are only conclusory allegations asserted against El Habti with no specific factual allegations regarding his state of mind. Simply alleging that he was deliberately

---

[24] *Id.* at 1029 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[25] *Ray v. Clardy*, 2022 WL 889932, at *5 (E.D. Okla. 2022) (citing *Iqbal*, 556 U.S. at 677)).

[26] *See Logan v. Regalado*, 2021 WL 819106, at *5 (N.D. Okla. 2021) (finding that although the allegations raised an inference that the staff knew of the plaintiff's condition and acted with deliberate indifference, the allegations failed to adequately allege that the sheriff and jail administrator acted with the same state of mind of deliberate indifference because there were no specific allegations as to their knowledge); *Wirtz v. Regalado*, 2020 WL 1016445, at *11 (N.D. Okla. 2020) (finding that the factual allegations raised a reasonable inference that the officer knew of the plaintiff's medical restrictions and recklessly disregarded them but that the supervisory liability claim against the sheriff failed because the allegations did not plausibly suggest that he knew of the plaintiff's medical condition and acted with deliberate indifference).

indifferent is insufficient to adequately allege the third element of a supervisory liability claim. Thus, Plaintiff fails to adequately state a claim against El Habti.[27]

**IT IS THEREFORE ORDERED** that Defendant Warden El Habti's Motion to Dismiss (Doc. 25) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant El Habti's Motion for Stay of Deadlines (Doc. 33) is **DENIED AS MOOT**.

**IT IS SO ORDERED**.

Dated this 19th day of July, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[27] Because the Court finds that Plaintiff fails to state a claim against El Habti, it need not address his qualified immunity argument.