IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1)  RITA CRAMPTON, Personal Representative of the Estate of Jane Ann Martin, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 21-CV-053-EFM-GLJ |
| (1)  CHRIS MORRIS, Sheriff of Pittsburg County, Oklahoma; | ) ) ) | |
| (2)  DOES I through X, | ) ) ) | |
| Defendants. | ) | |

---

## DEFENDANT CHRIS MORRIS IN HIS INDIVIDUAL CAPACITY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

---

Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Howard T. Morrow, OBA No. 32650
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:    (405) 524-2070
Facsimile:    (405) 524-2078
Email:          wbp@czwlaw.com
                    jcw@czwlaw.com
                    htm@czwlaw.com

***ATTORNEYS FOR DEFENDANT CHRIS MORRIS IN HIS INDIVIDUAL CAPACITY***

December 21, 2023

## **TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................ii-iv

LIST OF JOINT EXHIBITS.................................................................................... v-vi

STATEMENT OF THE CASE...................................................................................1

LCvR 56.1(b) STATEMENT .....................................................................................2

STANDARD OF REVIEW FOR SUMMARY JUDGMENT ....................................11

I.      Plaintiff Cannot Establish Liability Against Defendant in his Individual Capacity..........12

II.     Defendant Morris is Entitled to Qualified Immunity.........................................17

CONCLUSION.........................................................................................................22

CERTIFICATE OF SERVICE .................................................................................24

# **TABLE OF AUTHORITIES**

## **CASES**

*Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995) ........................................... 18

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) .................................... 11

*Aldaba v. Pickens*, 844 F.3d 870 (10th Cir. 2016) ......................................................... 20

*Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) .............. 19, 20, 21

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 11, 19

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ..................................................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) .............................................. 14

*Barrie v. Grand Cty.*, 119 F.3d 862 (10th Cir. 1997) .................................................... 22

*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 (10th Cir. 1990) ...................... 15

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ........................................................................ 15

*Brousseau v. Haugen*, 125 S. Ct. 596, 60 L. Ed. 2d 583 (2004) ................................... 18

*Bruner v. Baker*, 506 F.3d 1021 (10th Cir. 2007) ........................................................ 12

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) ................................................. 14, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 11

*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) ....................................................... 12

*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994) ........................ 11

*Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015) ........................................................ 21, 22

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) ................................................ 13

*Elder v. Holloway*, 510 U.S. 510 (1994) ...................................................................... 20

*Estate of B.I.C. v. Gillen*, 761 F.3d 1099 (10th Cir. 2014) .......................................... 20

*Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014) ................................ 14, 15, 17

*Foote v. Spiegel*, 118 F.3d 1416 (10th Cir. 1997) .......................................................................... 12

*Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006) ........................................................................ 19

*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) ........................................................................ 11

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) ........................................................... 18

*Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 532, 116 L.Ed.2d 589 (1991) .................................. 18

*Klein v. City of Loveland*, 661 F.3d 498 (10th Cir. 2011) ........................................................... 20

*McClelland v. Facteau*, 610 F.2d 693 (10th Cir. 1979) ............................................................... 15

*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996) .......................................................................... 18

*Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) .............................. 18

*Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996) .................................................................. 13

*Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012) .......................................................................... 19

*Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F. 3d 1238 (10th Cir. 1999) .................... 13, 17

*Novitsky v. City of Aurora*, 491 F.3d 1244 (10th Cir. 2007) .................................................. 12, 14

*Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272 (10th Cir. 2001) .......................................... 17, 22

*Pahls v. Thomas*, 718 F.3d 1210 (10th Cir. 2013) ...................................................................... 14

*Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ............................ 18

*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996) ....................................... 11

*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ....................... 18, 19, 21

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990) ......................................................................... 12

*White v. Pauly*, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) ............................................................ 20

*Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) .................................. 15

*Wright v. Rasmussen*, No. 17-CV-159-JHP, 2018 WL 4832356 (E.D. Okla. Oct. 4, 2018) ........ 13

**FEDERAL STATUTES AND RULES**

42 U.S.C. § 1983 ................................................................................................... *passim*

LCvR 56(a) ...................................................................................................................... 11

LCvR 56.1(b) ...................................................................................................................... 2

**JOINT APPENDIX OF EXHIBITS TO CHRIS MORRIS'S MOTIONS
<u>FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT</u>**

Exhibit 1 – Inmate Booking Sheet

Exhibit 2 – Declaration of Sheriff Chris Morris

Exhibit 3 – Excerpt from Deposition of Sheriff Chris Morris

Exhibit 4 – Excerpt from Deposition of Dr. Richard Helton

Exhibit 5 – Medical Service Contract

Exhibit 6 – Excerpt from Deposition of Tyler Bigelow

Exhibit 7 – Excerpt from Deposition of Tammy Davidson

Exhibit 8 – Excerpt from Deposition of Loyd London

Exhibit  9 – Inmate Medical Questionnaire

Exhibit 10 – November 7, 2019 Medical Request

Exhibit 11 – Excerpt from Deposition of Doris Crawford

Exhibit 12 – Carl Albert Outpatient Discharge Summary

Exhibit 13 – Transcript of November 5, 2019 revocation hearing

Exhibit 14 – Jail Log

Exhibit 15 – Jail Log

Exhibit 16 –November 12, 2019 Medical Request

Exhibit 17 – Jail Log

Exhibit 18 – Release Sheet

Exhibit 19 – DOC Medical Record

Exhibit 20 – DOC Medical Record

Exhibit 21 – DOC Medical Record

Exhibit 22 – DOC Medical Record

Exhibit 23 – Incident/Staff Report

Exhibit 24 – SSM Health Records

Exhibit 25 – Medical Examiner's Report

Exhibit 26 – Medical Screening Policy

Exhibit 27 – Medical Care and Health Services Policy

Exhibit 28 – Booking and Female Tower Logs

Exhibit 29 –  McAlester 911 records

Exhibit 30 – Jailer Training Records

Exhibit 31 – Sheriff Chris Morris CLEET record

Exhibit 32 – Unpublished Opinion and Order in *Jones v. Hacker*

Exhibit 33 – Unpublished Opinion and Order in *Wright v. Rasmussen*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

(1)    RITA CRAMPTON, Personal Representative    )
       of the Estate of Jane Ann Martin, deceased,    )
                                                      )
                              Plaintiff,              )
                                                      )
v.                                                    )    Case No. 21-CV-053-EFM-GLJ
                                                      )
(1)    CHRIS MORRIS, Sheriff of Pittsburg County,    )
       Oklahoma;                                     )
(2)    DOES I through X,                             )
                                                      )
                              Defendants.             )

**DEFENDANT CHRIS MORRIS IN HIS INDIVIDUAL CAPACITY'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant Chris Morris, in his individual capacity, ("Defendant") moves the Court to grant summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56(a) with regard to Plaintiff's individual capacity claims against him. In support thereof, Defendant submits the following Brief:

**STATEMENT OF THE CASE**

Plaintiff, on behalf of the Estate of Decedent Jane Ann Martin, has brought this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while at the Pittsburg County Criminal Justice Center ("PCCJC") between November 5-14, 2019, Decedent was denied adequate medical care which resulted in her death on November 14, 2019 after she had been transferred to and was in the custody of the Oklahoma Department of Corrections ("DOC"). Plaintiff alleges inadequate policies and/or training by the Sheriff, who was responsible for the operation of the PCCJC. No jail or DOC individual staff members or medical providers are named as defendants. Sheriff Morris

has been named as a Defendant in both his individual capacity and in his official capacity as Sheriff of Pittsburg County.[1]

## **LCvR 56.1(b) STATEMENT**

Pursuant to LCvR 56.1(b), Defendant asserts that there is no genuine dispute as to the following material facts:

1.      The Decedent, Jane Ann Martin, was booked into the Pittsburg County Criminal Justice Center "(PCCJC") on November 5, 2019, at approximately 4:52 p.m., to be held until she could be transported to the Oklahoma Department of Corrections for a 6-month sanction for a probation and parole violation in Pittsburg County Case No. CF-14-834. (Ex. 1, Inmate Booking Sheet).[2]

2.      At the time of the incarceration of the Decedent, the PCCJC employed a registered nurse, Doris Crawford, as medical personnel to provide medical care and assist in medical evaluations. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 63:13-24).

3.      At the time of the incarceration of the Decedent, the PCCJC also contracted with an outside medical doctor, Dr. Richard Helton, to provide medical services to inmates at the PCCJC. Pursuant to the contract, Dr. Helton was to conduct on-site examinations at least one day a week. In addition, the doctor was available 24 hours a day/7 days a week to answer questions regarding inmate medical issues brought by Nurse Crawford or staff members. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 35:9 – p. 36:6; p. 67:20 – p. 68:6; Ex. 4, Dr. Helton Depo.,

---

[1] Sheriff Morris submits this Motion for Summary Judgment against claims made against him in his individual capacity.  A separate Motion for Summary Judgment addressing the official capacity claims made against Sheriff Morris is being filed contemporaneous with this Motion.

[2] All references to any exhibits are contained in the Joint Appendix of Exhibits filed contemporaneously with this Motion and the Motion for Summary Judgment filed on behalf of Defendant Chris Morris in his official capacity.

p. 18:1-5; p. 20:20 – p. 21:10; p. 23:17-18; p. 25:7-20; p. 74:22 – p. 75:25; p. 95:4-13; Ex. 5,

Medical Service Agreement).

4.      At the time of the incarceration of the Decedent, the operation of the PCCJC was

under the direct supervision of Chief of Security/Jail Administrator Loyd London. Defendant

Morris was not involved in the day-to-day operations of the jail but did become involved in the

jail related issues if London or other staff members advised him of an issue and requested his

participation in any action or decision. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo.,

p. 48:8 – p. 49:8; p. 61:1-6).

5.      At the time of the incarceration of the Decedent, if an inmate needed medical care,

they could submit a kiosk request to Nurse Crawford or London, or could make a request to a

detention officer who would then relay the request to Nurse Crawford. (Ex. 3, Morris Depo., p.

62:17-24; Ex. 6, Bigelow Depo., p. 21:24 – p. 22:24; Ex. 7, Davidson Depo., p. 45:8 – p. 46:5; p.

47:19 – p. 48:9; p. 72:13 – p. 73:23; p. 111:5-19; Ex. 8, London Depo., p. 23:11-21).

6.      At the time of booking, an Inmate Medical Questionnaire was completed for the

Decedent by Detention Officer Tyler Bigelow whereon it was indicated that the Decedent had

visible signs of alcohol or drug withdrawal, that the Decedent had "visible signs of trauma, illness

obvious pain or bleeding, requiring immediate emergency or doctor's care," with an explanation

of "sciatic nerve," noting that the Decedent was allergic to Ultram, and noting that the Decedent

experienced flu-like withdrawal symptoms whenever she stopped drinking or using drugs. (Ex. 9,

Inmate Medical Questionnaire; Ex. 6, Bigelow Depo., p. 24:17 – p. 25:12; p. 30:13-24).

7.      Bigelow did not believe that the Decedent needed emergency medical care or have

any concerns about her immediate physical well-being at the time of booking. He could see that

she had difficulty standing up and she said she had sciatic problems and that her back was hurting.

His indication that the Decedent had "visible signs of trauma, illness obvious pain or bleeding,

3

requiring immediate emergency or doctor's care," with an explanation of "sciatic nerve" was mistakenly placed in the wrong box of the questionnaire. (Ex. 6, Bigelow Depo., p. 41:25 – p. 43:10; p. 46:21-25; p. 49:10-16; p. 59:18-25; p. 61:8-21).

8.      When booking an inmate, if there was anything that gave Bigelow concern on a medical questionnaire, he would tell Nurse Crawford, or call for EMS if it appeared to be a life-threatening or severe medical emergency. He would also make a note to pass the information on to next shift. (Ex. 6, Bigelow Depo., p. 36:10 – p. 38:25).

9.      On November 7, 2019, at approximately 2:02 p.m., the Decedent submitted a medical request through the PCCJC's kiosk system stating that she had a pinched sciatic nerve and psoriasis and was suffering from opioid withdrawals, and stating that she could barely walk, and advising that she had no medication. The Decedent requested to be taken to Carl Albert for her bipolar meds. Nurse Crawford responded at approximately 3:47 p.m., telling the Decedent that she could be treated once she was transported to DOC and advising her that she could give her some Ibuprofen/Tylenol and some Vick's for the psoriasis. At approximately 3:59 p.m., the Decedent replied "that would be great please." (Ex. 10, November 7, 2019 Medical Request).

10.     Nurse Crawford called Carl Albert in reference to the Decedent's request regarding bipolar meds and was advised that the Decedent was not an open client with Carl Albert at that time and, as such, Crawford could not simply have them fill a prescription for the Decedent. It would have taken 4-6 weeks to get the Decedent an appointment at Carl Albert. (Ex. 11, Crawford Depo., p. 97:23 – p. 99:4; Ex. 12, Carl Albert Outpatient Discharge Summary).

11.     Decedent admitted at a hearing on November 5, 2019 that she had had the sciatic or pinched nerve in her back for a long time and that there was nothing anyone could do for it, and also admitted that while she had previously been diagnosed as bipolar, she had voluntarily stopped taking her medication as early as early as two (2) years before November 2019, the time frame of

4

which she remembered because she stopped taking her medications about the same time she stopped reporting to her probation officer. (Ex. 13, Transcript of November 5, 2019 revocation hearing, pp. 7:10-13; 19:1-19, 24-25 – 20:1-9; 21:10-17).

12.     On November 7, 2018, at approximately 7:52 p.m., the Decedent's blood pressure was taken by detention officer Taylor Tate. The BP was 134/69 with a heart rate of 101 bpm. (Ex. 7, Davidson Depo., p. 77:2-14; p. 78:7 – p. 79:11; p. 85:22 – p. 86:16; Ex. 14, Jail Log).

13.     On November 9, 2019, at approximately 4:30 p.m., Detention Officer Rhonda Tripp went into the Decedent's pod to check on her. (Ex. 7, Davidson Depo., p. 90:22 – p. 91:2; p. 92:6-19; Ex. 15, Jail Log).

14.     On November 12, 2019, at approximately 10:01 a.m., the Decedent submitted a medical request through the PCCJC's kiosk system stating that she was very sick, couldn't exhale all the way, and that this had been going on since before she got to the PCCJC. She further stated that she was running a fever and was very weak, and requested some Mucinex. She further stated that her chest hurt and she felt a fluttering sensation when her heart beats. She further stated that the water was hurting her insides and asked how she could get some drinking water and vitamin C. She also stated that she was afraid of pulmonary embolism and pneumonia. Nurse Crawford responded at approximately 12:09 p.m., telling the Decedent she would put her on Mucinex twice daily for a week. (Ex. 16, November 12, 2019 Medical Request).

15.     On November 13, 2018, at approximately 11:10 p.m., Detention Officer Tammy Davidson gave the Decedent two Tylenol for pain in her side. (Ex. 7, Davidson Depo., p. 97:17 – p. 98:22; Ex. 17, Jail Log).

16.     On November 14, 2019, at approximately 2:22 a.m., the Decedent's blood pressure was taken by Detention Officer Taylor Tate. The BP was 143/70 with a heart rate of 106 bpm. Tate suggested for the Decedent to put in a medical request to Nurse Crawford for high blood

pressure meds, but the Decedent told her that Nurse Crawford told her that she was going to DOC soon and they would handle it there. (Ex. 7, Davidson Depo., p. 99:24 – p. 100:17; p. 102:21 – p. 103:13; Ex. 15, Jail Log).

17.     On November 14, at approximately 7:54 a.m., the Decedent was released from the custody of the PCCJC and transported to the DOC's Mabel Bassett facility by Administrator London. He did not observe her to be in any apparent medical distress at that time, and she did not discuss her medical condition with him or make any complaints to him about not receiving adequate medical care in the PCCJC. (Ex. 18, Release Sheet; Ex. 15, Jail Log; Ex. 3, Morris Depo., p. 70:8-11; Ex. 8, London Depo., p. 71:11 – p. 73:15; p. 76:6-11; p. 79:8-21; p. 104:23 – p. 105:13).

18.     At approximately 11:02 a.m., LPN Kathryn Burton completed the Decedent's Medical/Mental Health Screening at Mabel Basset. The Decedent stated to Nurse Burton that she thought she may be detoxing from heroin. The Decedent's vital signs included a heart rate of 113 bpm; blood pressure of 163/96; respirations of 18 breaths per minute; oxygen saturation of 98%; and a temperature of 98.8°F. (Ex. 19, DOC Medical Records).

19.     At approximately 12:50 pm, the Decedent's vital signs were taken again. At that time, she had a blood pressure of 208/109; pulse of 132 bpm; respirations of 16 breaths per minute; oxygen saturation 99%; and temperature of 100.4°F. (Ex. 20, DOC Medical Records).

20.     At approximately 1:49 p.m., the Decedent's vital signs were taken again. At that time, she had blood pressure of 161/89; pulse of 120 bpm; respirations of 24 breaths per minute; oxygen saturation of 98%; and temperature of 103.6°F. (Ex. 21, DOC Medical Records).

21.     At approximately 2:21 p.m., the Decedent's pulse and blood pressure were re-measured as 129/67 (blood pressure) and 104 bpm (pulse). No temperature, respirations, or oxygen saturation were measured. (Ex. 21, DOC Medical Records).

22.     At approximately 3:22 p.m., the Decedent's vital signs were taken again. At that time, she had a blood pressure of 118/53; pulse of 85 bpm; oxygen saturation of 98%; and temperature of 97.3°F. No respirations were measured. (Ex. 21, DOC Medical Records).

23.     At approximately 3:30 p.m., NP Karen Barnor documented that she heard the Decedent complain that she could not breathe and went to her cell. NP Barnor noted the Decedent's oxygen saturation to be 99%, and she ordered Vistaril for her. A few minutes later, NP Barnor again heard that the Decedent was complaining of difficulty breathing and again went to her cell. At that time, the Decedent appeared diaphoretic, pale, lethargic, and felt clammy, so NP Barnor directed EMS to be called. EMS arrived at the facility and took over treatment of the Decedent at approximately 4:10 p.m. (Ex. 22, DOC Medical Records; Ex. 23, Incident/Staff Report).

24.     On the way to the hospital, EMS personnel initiated cardiopulmonary resuscitation for the Decedent, and at approximately 7:02 p.m., Dr. Thompson pronounced her deceased as the result of cardiac arrest. The autopsy of the Decedent indicated that she had a right coronary artery ostium occlusion by aortic valve vegetation secondary to chronic bacterial endocarditis. (Ex. 24, SSM Health Records; Ex. 25, Medical Examiner's Report).

25.     At the time relevant to this suit, the PCCJC had a Medical Screening Policy which required a medical screening to be performed on all incoming inmates prior to being placed in general population. This was to provide that individuals with significant medical or psychiatric problems, or who may be a suicide risk, were identified and transported to a medical facility as soon as possible. The policy required such individuals to be housed separately in a location where they could be observed frequently until a medical evaluation could be completed. (Ex. 26, Medical Screening Policy).

26.     The Medical Screening Policy provided that medical screening was performed by visual observation and verbal questioning of the incoming inmate to determine if medical attention

was needed prior to their being placed in the facility. The screening would also provide a written record of the inmate's current illnesses and health problems; behavioral observations; notation of body deformities, trauma, bruises, lesions, etc.; the condition of skin and body orifices; and disposition/referral of the inmate to qualified medical personnel on an emergency basis. If the need was indicated, the policy also allowed for the transport of the prisoner to the emergency room for evaluation by a qualified licensed medical doctor. (Ex. 26, Medical Screening Policy).

27.     At the time relevant to this suit, the PCCJC had a Medical Care and Health Services Policy which stated that adequate medical care will be provided in the facility by maintaining an established health care plan that states what is to be done in situations involving the health and medical care of inmates at the facility. The procedure includes 32 separate provisions, including: that a receiving screening will be completed for all inmates before they are housed in the living area of the jail; inmates will be informed upon admission to the jail how to access medical and health care services; inmates transferred to other institutions after receiving medical treatment or referral while at the PCCJC will have their records accompany them to the receiving facility; inmates held for more than 48 hours will undergo a complete physical examination by qualified medical personnel if the initial medical screening indicates that such an examination is needed; and that inmates are entitled to sick call conducted by a qualified and licensed medical personnel within 48 hours of a valid written request. (Ex. 27, Medical Care and Health Services Policy).

28.     PCCJC detention officers were provided copies of the PCCJC policies and procedures and the Oklahoma jail standards. (Ex. 3, Morris Depo., p. 81:24 – p. 82:3; Ex. 6, Bigelow Depo., p. 14:7-17; Ex. 7, Davidson Depo., p. 25:11-17; Ex. 8, London Depo., p. 44:15-16).

29.     At the time of the incarceration of the Decedent, all staff had authority to contact Nurse Crawford or the retained doctor, Dr. Richard Helton, if a medical condition arose which

they believed needed guidance or immediate assistance. Pursuant to training, regularly contacted Nurse Crawford for direction in handling inmate requests i.e. pulled inmates for assessments by Nurse Crawford; transported inmates for Doctor Appointments at outside medical facilities for treatment.  Further, all staff had authority to immediately contact 911 to request emergency medical services or to transport an inmate to the local emergency room if the need arose. Staff utilized emergency services for medical conditions, such as: possible heart attack, seizures, coughing up blood, staph infections, unresponsiveness, injuries, chest pains, blood pressure problems, possible stroke, etc. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 63:25 – p. 64:5; p. 104:14-17; Ex. 6, Bigelow Depo., p. 22:25 – p. 24:12; Ex. 7, Davidson Depo., p. 32:20-22; Ex. 28, Booking and Female Tower Logs; Ex. 29, McAlester 911 records).

30.     New detention officers at the PCCJC received on the job training for approximately two weeks, including training on how to prepare a medical questionnaire, to identify if an incoming inmate needs to medically evaluated by the nurse, to identify signs of alcohol and drug withdrawal, and what to do if they encounter an inmate with a serious medical condition when Nurse Crawford is not on duty. All detention officers also receive annual jailer training on the jail policies and procedures the Oklahoma jail standards, including basic first aid. (Ex. 3, Morris Depo., p. 88:18 – p. 89:5; p. 93:4 – p. 94:18; 97:7-18; Ex. 6, Bigelow Depo., p. 13:16 – p. 14:6; p. 28:17 – p. 29:6; p. 35:1-6; p. 35:21 – p. 36:2; p. 40:4-14; Ex. 7, Davidson Depo., p. 30:15 – p. 31:6; p. 109:11-15; p. 113:6 – p. 114:5; p. 129:1 – p. 131:25; p. 132:18 – p. 133:8; Ex. 8, London Depo., p. 44:10 – p. 45:15; p. 46:24 – p. 48:14; p. 49:12 – p. 51:15; p. 53:10 – p. 55:13; p. 84:1-16; p. 92:5-20; Ex. 30, Jailer Training Records; Ex. 31, Sheriff Morris CLEET record).

31.     At no time prior to the incarceration of the Decedent did Defendant Morris have any belief or knowledge that the policies and procedures that had been enacted and were in place

at the PCCJC were inadequate and/or insufficient to insure the proper providing of medical care for serious medical needs. (Ex. 2; Declaration of Chris Morris).

32.     At no time prior to the incarceration of the Decedent did Defendant Morris have any belief or knowledge that the policies and procedures were inadequate to insure adequate inmate medical screenings or examinations during booking or adequate medical examinations upon the nurse or staff advising of a serious medical condition. (Ex. 2, Declaration of Chris Morris).

33.     At no time prior to the incarceration of the Decedent did Defendant Morris have any knowledge or belief that Nurse Crawford was not performing her duties as expected, not providing adequate medical care, or not following the dictates of policies and procedures regarding medical care and the treatment of inmates. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 39:16-24; p. 103:2-18; Ex. 8, London Depo., p. 81:1-6; p. 104:7-22).

34.     At no time prior to the incarceration of the Decedent, did Defendant Morris have any knowledge, information or belief that jail staff were not appropriately responding to requests for medical care. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 47:17 – p. 48:6; p. 105:15-20).

35.     At no time prior to the Decedent's death, did Defendant Morris have any knowledge of her medical condition, or have any involvement in any decision concerning any aspect of her incarceration at the PCCJC, or any decision or knowledge of any medical decisions being made in regards to the Decedent. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 64:6-25; p. 68:24 – p. 69:13).

36.     Defendant Morris did not know the Decedent, did not know of her incarceration in November 2019, did not know of any of her medical requests and did not have any role in any part of the Decedent's incarceration or any decision or action regarding her medical requests or the

10

care provided. (Ex. 2, Declaration of Chris Morris; Ex. 3, Morris Depo., p. 64:6-25; p. 68:24 – p. 69:13).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing *Celotex*, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). Moreover, "(i)n response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not

escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## I.   PLAINTIFF CANNOT ESTABLISH LIABILITY AGAINST DEFENDANT IN HIS INDIVIDUAL CAPACITY.

Plaintiff has sued Defendant Morris in his individual capacity. To show a constitutional violation by Defendant Morris in his individual capacity under § 1983, Plaintiff "must establish [Defendant Morris] acted under color of state law and caused or contributed to the alleged violation." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citing *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991), *overruled on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 2179-82, 135 L.Ed.2d 606 (1996)); *see also Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). In this regard, personal participation is essential to find liability. As such, in order to establish liability under § 1983 against Defendant Morris in his individual capacity, Plaintiff must show that he acted under color of state law and that he personally participated in the alleged constitutional violation(s). *See Bruner v. Baker*, 506 F.3d 1021, 1026 (10th Cir. 2007); *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).

It is insufficient for Plaintiff to merely show that Defendant Morris had authority over those who allegedly committed a constitutional tort. *Jenkins*, 81 F.3d at 994. Rather, in order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1254 (10th Cir. 2007) (police officer who was present at scene but who did not assist or direct other officer in removing arrestee from vehicle did not violate Fourth Amendment; he did not "personally participate" in the use of the twist-lock restraint). Accordingly, Plaintiff must demonstrate "a deliberate, intentional act" by [Defendant Morris] to violate constitutional rights." *Id.* at 994-95. Furthermore, "'[L]iability under §1983 must be predicated upon a 'deliberate' deprivation of

constitutional rights by the defendant and not upon mere negligence.'" *Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F. 3d 1238, 1250 (10th Cir. 1999) (citing *Woodward v. City of Worland,* 977 F. 2d 1392, 1399 (10th Cir. 1992)). Plaintiff cannot show this with respect to Defendant Morris.

Plaintiff may argue that, as Sheriff, Defendant Morris can be held liable in his individual capacity under § 1983 for the creation, promulgation, implementation, or continued operation of a policy or custom that caused a violation of the Decedent's constitutional rights. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). However, as set forth in Defendant Morris in his official capacity's summary judgment motion filed simultaneously herewith and which is hereby adopted by reference, Plaintiff has failed to demonstrate a constitutional violation by Defendant Morris in his official capacity based on any policy, practice, or custom of the PCCJC. Consequently, any individual capacity claim against Defendant Morris on that basis must likewise fail. Moreover, as discussed further below, Plaintiff cannot demonstrate that Defendant Morris was deliberately indifferent to a substantial risk that any agent, employee, or officer of the PCCJC would violate the Decedent's constitutional rights.

Supervisory "status by itself is insufficient to support liability." *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996)). It is insufficient for Plaintiff to merely show that the Defendant Morris had authority over others that may have violated the Decedent's constitutional rights. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996). Additionally, "[i]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the supervisor had done more than he or she did." *Wright v. Rasmussen*, No. 17-CV-159-JHP, 2018 WL 4832356, at *7 (E.D. Okla. Oct. 4, 2018) (unpub)[3] (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)). Rather, in order for liability to arise under § 1983, a defendant's direct personal

---

[3] A copy of this published Opinion and Order is attached as Ex. 33.

responsibility for the claimed deprivation of constitutional rights must be established. *Novitsky*, 491 F.3d at 1254. Accordingly, Plaintiff must demonstrate "a deliberate, intentional act" by [Defendant Morris] to violate constitutional rights." *Id.* at 994-95.

In order to prevail on such a claim, Plaintiff must present evidence of an affirmative link between the alleged constitutional violation and Defendant Morris' actions. *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014).

> This requires "more than a supervisor's mere knowledge of his [or her] subordinate's conduct"…Rather a plaintiff must satisfy "three elements…to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind."

*Id.* (quoting *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, (10th Cir. 2013)). In the wake of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009), which "articulated a stricter liability standard for…personal involvement," *Schneider*, 717 F.3d at 768, the exact contours of the first element of supervisory liability remain somewhat unclear. *Estate of Booker*, *supra*. However, "direct participation" is not necessary to satisfy this element. *Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013). A plaintiff can show an affirmative link between the alleged constitutional violation and a supervisor's actions "by establishing 'the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy,' or 'the establishment or utilization of an unconstitutional policy or custom'…provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado*, 935 F.3d 960, 997 (10th Cir. 2019) (quoting *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) and *Dodds*, 614 F.3d at 1199)).

"The second element 'requires the plaintiff to show that the defendant's alleged actions(s) caused the constitutional violation' by setting 'in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff or her constitutional

14

rights.'" *Estate of Booker*, *supra*. (quoting *Schneider*, 717 F.3d at 768). "The third element 'requires the plaintiff to show that the defendant took the alleged actions with the requisite state of mind…" *Id.* (quoting *Schneider*, 717 F.3d at 769). With respect to the third element, "a plaintiff can 'establish the requisite state of mind by showing that [a supervisor] 'acted with deliberate indifference.'" *Burke*, 935 F.3d at 997 (quoting *Perry v. Durborow*, 892 F.3d 1116, 1122 (10th Cir. 2018)). "[A] local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff." *Id.* at 998 (quoting *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997)).

Mere negligence – even gross negligence – is insufficient to support a claim of deliberate indifference under § 1983. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[D]eliberate indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action."). "It is obduracy and wantonness, not inadvertence or error in good faith," that violate the Constitution. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Furthermore, in order to establish a failure to supervise claim, Plaintiff "must show that the defendant was adequately put on notice of prior misbehavior." *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979).

Here, there is no allegation or evidence that Defendant Morris personally participated in the alleged denial of medical care to the Decedent. (Fact Nos. 4, 35, 36). As Defendant Morris was not directly involved in the subject incidents, Plaintiff's claims against him are necessarily predicated upon Defendant Morris's actions in his supervisory capacity. However, Plaintiff cannot

15

demonstrate any affirmative link between any act or omission by Defendant Morris and the alleged violation of the Decedent's constitutional rights; nor can she establish that Defendant Morris was deliberately indifferent to any substantial risk of harm to the Decedent.

First, Plaintiff cannot demonstrate that Defendant Morris was deliberately indifferent to a substantial risk that PCCJC inmates would receive inadequate access to health care. At the time of the incarceration of the Decedent, the PCCJC employed a registered nurse, Doris Crawford, as medical personnel to provide medical care and assist in medical evaluations. (Fact No. 2). Furthermore, at the time of the incarceration of the Decedent, the PCCJC also contracted with an outside medical doctor, Dr. Richard Helton, to provide medical services to inmates at the PCCJC. Pursuant to the contract, Dr. Helton was to conduct on-site examinations at least one day a week. In addition, the doctor was available 24 hours a day/7 days a week to answer questions regarding inmate medical issues brought by Nurse Crawford or staff members. (Fact No. 3). However, at no time prior to the incarceration of the Decedent did Defendant Morris any knowledge or belief that Nurse Crawford was not performing her duties as expected, providing inadequate medical care, or not following the dictates of policies and procedures regarding medical care and the treatment of inmates. (Fact No. 33). Likewise, at no time prior to the incarceration of the Decedent, did Defendant Morris have any knowledge, information or belief that jail staff were not appropriately responding to requests for medical care. (Fact No. 34). Moreover, at no time prior to the incarceration of the Decedent did Defendant Morris have any belief or knowledge that the policies and procedures that had been enacted and were in place at the PCCJC were inadequate and/or insufficient to insure the proper providing of medical care for serious medical needs. (Fact No. 31). Additionally, at no time prior to the incarceration of the Decedent did Defendant Morris have any belief or knowledge that the policies and procedures were inadequate to insure adequate inmate

medical screenings or examinations during booking or adequate medical examinations upon the nurse or staff advising of a serious medical condition. (Fact No. 32).

Furthermore, with regard to Plaintiff's denial of medical care claim, it is critical to note that Tenth Circuit law requires a supervisor to have the requisite state of mind to commit the alleged constitutional violation "which 'can be no less than then *mens rea* required' of the subordinates to commit the underlying constitutional violation." *Estate of Booker*, 745 F.3d at 435 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)). To show a constitutional violation for denial of medical care by any of Defendant Morris's subordinates, Plaintiff would have to show that they were subjectively aware that the Decedent faced a substantial risk of harm due to an objectively serious medical need, and that they failed to take reasonable measures to abate it. *See Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272, 1276-77 (10th Cir. 2001). Here, however, there is no evidence that Defendant Morris had any knowledge of the Decedent or her medical condition at the time of the alleged constitutional violation, let alone any evidence that she faced a substantial risk of harm from such condition. (Fact Nos. 35, 36). As such, Plaintiff cannot demonstrate the requisite state of mind on the part of Defendant Morris to hold him liable in his supervisory capacity with regard to her denial of medical care claims.

Accordingly, Defendant Morris is entitled to summary judgment with regard to Plaintiff's claims against him in his individual capacity.

## II.   DEFENDANT MORRIS IS ENTITLED TO QUALIFIED IMMUNITY.

Defendant Morris is entitled to qualified immunity in this case. Defendants sued in their individual capacities in an action under 42 U.S.C. § 1983 "are entitled to qualified immunity unless it is demonstrated that their conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999). Qualified immunity is therefore an affirmative defense that provides

immunity to suit in a § 1983 action. *Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). When the defense is raised, the plaintiff bears the burden to show the defendant's actions violated a constitutional right, and that the allegedly violated right was clearly established at the time of the conduct at issue. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). Qualified immunity is an entitlement not to stand trial or face the burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 527, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). It is an immunity from suit rather than a mere defense to liability. *Id.*, 472 U.S. at 527. Qualified immunity gives ample room for mistaken judgment by protecting all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 532, 537, 116 L.Ed.2d 589 (1991). The issue of qualified immunity is for the courts and not the trier of fact. *Id*.

As a threshold matter, if no federal right on the facts alleged would have been violated, no further inquiry is required, and the defendant is entitled to dismissal. *Saucier v. Katz*, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (*overruled in part, Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). If a violation of federal rights could be made out, then "[t]he relative, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official in the defendant's position] that his conduct was unlawful in the situation he confronted." *Id.* at 202; *see also Brousseau v. Haugen*, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) (emphasizing inquiry should be conducted in light of the specific context of the case.)

Here, as discussed above, Plaintiff has failed to show that Defendant Morris violated the Decedent's constitutional rights. Accordingly, Defendant Morris is entitled to qualified immunity and Plaintiff's § 1983 claims against him should be dismissed. *See Hinton v. City of Elwood*, 997 F.2d 774, 783 (10th Cir. 1993) (citing *Siegert v. Gilley*, 500 U.S. 226, 231-33, 111 S.Ct. 1789, 114

18

L.Ed.2d 277 (1991)) (officer entitled to qualified immunity if their conduct did not violate the law).

However, even if the Court should find that Defendant Morris violated the Decedent's constitutional rights, he would still be entitled to qualified immunity as it was not clearly established that his actions were unconstitutional. In *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the U.S. Supreme Court explained that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." (internal citations omitted). *See also Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) ("The law is clearly established if a reasonable official in the defendant's circumstances would understand that her conduct violated the plaintiff's constitutional right."). The qualified immunity analysis in this regard is analyzed "in a more particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640. Specifically, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id. See also Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

Deciding when a right is "clearly established" is a crucial part of qualified immunity analysis. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations and quotations omitted). "The question of whether a right is clearly established must be answered in light of the specific context of the case, not as a broad general proposition." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (internal quotations omitted). "The Supreme Court has 'repeatedly told courts not to define clearly established law at a high level

of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014), alterations omitted); *see also White v. Pauly*, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). Thus, "a general statement of law...is not sufficient to show that the law was clearly established." *Gillen*, 761 F.3d at 1106.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klein v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640. "[T]he plaintiff's burden in responding to a request for judgment based on qualified immunity is to identify the universe of statutory or decisional law from which the [district] court can determine whether the right allegedly violated was clearly established." *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (citation and quotation marks omitted). While the court need not point to any prior authority which has precisely the same facts of this case in order to find clearly established law, existing precedent must "squarely govern" the case and "must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016) (citations and internal quotation marks omitted). "[C]learly established law must be 'particularized' to the facts of the case." *White*, 137 S.Ct. at 552.

The legal principle that an inmate is entitled to access to adequate medical care is indeed well established; however, the qualified immunity analysis in this regard is analyzed "in a more particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640. Specifically, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right." *Id. See also Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The question is not whether the Decedent had such rights, but whether it was clearly established that Defendant Morris' actions violated those rights. *Id.* Because Plaintiff's individual capacity claims against Defendant Morris implicate liability in his supervisory capacity, she must "identify a case where an offic[ial] acting in similar circumstances as [Defendant Morris] was held have violated the Eighth or Fourteenth Amendments under a theory of supervisory liability." *Perry v. Durborow*, 892 F.3d 1116, 1124 (10th Cir. 2018) (citation and internal quotation marks omitted).

In light of the specific context of this case and the qualified immunity inquiry, Plaintiff cannot show that Defendant Morris violated Garland's clearly established, federal constitutional rights. Plaintiff cannot cite to any U.S. Supreme Court or Tenth Circuit authority which clearly establishes that an official can be held liable in his supervisory capacity for an alleged denial of medical care by his subordinates where the supervisor had no subjective knowledge of the inmate's medical condition, was not subjectively aware of any deficiencies in the facility's provision of inmate medical care. Nor can Plaintiff demonstrate that the combined weight of authority from other courts puts the issue beyond debate such that every reasonable official would have understood that Defendant Morris' actions or lack of action were a violation of federal constitutional rights.

To the contrary, with regard to Plaintiff's denial of medical care claims, the Tenth Circuit has held that a supervisor who had no subjective knowledge of an inmate's medical condition did not violate clearly established law and was entitled to qualified immunity in his individual, supervisory capacity with regard to a denial of medical care claim. In *Cox v. Glanz*, 800 F.3d 1231 (10th Cir. 2015), the court, on in interlocutory appeal from the district court's denial of qualified immunity to the defendant sheriff, examined the issue of whether it was clearly established that

21

the sheriff's supervisory conduct was in violation of the constitutional rights of an inmate who committed suicide in the jail.[4] The court found that the law was not clearly established in this regard because the controlling case law required plaintiff to show that the sheriff had the same *mens rea* required of any of his subordinates to commit the underlying constitutional violation, and because the controlling case law required subjective knowledge of a substantial risk that the inmate would commit suicide. *Id*. at 1247-52. Finding that there was no evidence that the defendant sheriff had subject knowledge of a substantial risk that the inmate would commit suicide, the court held that the district court erred in denying qualified immunity to the sheriff. *Id*. at 1252-54.

Likewise, as discussed above, to show a constitutional violation for denial of medical care by any of Defendant Morris' subordinates, Plaintiff would have to show that they were subjectively aware that the Decedent faced a substantial risk of harm due to an objectively serious medical need, and that they failed to take reasonable measures to abate it. *See Oxendine*, *supra*. However, there is no evidence that Defendant Morris had any knowledge of the Decedent or her medical condition at the time of the alleged constitutional violation, let alone any evidence that she faced a substantial risk of harm from such condition. (Fact Nos. 35, 36). As such, the law is not clearly established that Defendant Morris' conduct was in violation of the Decedent's right to medical care and he is entitled to qualified immunity in that regard.

## CONCLUSION

Defendant Sheriff Chris Morris, in his individual capacity, is entitled to summary judgment in this case. Plaintiff cannot show that Defendant Morris, acting in his supervisory capacity, was subjectively aware of, or was deliberately indifferent to, a substantial risk that any agent, employee

---

[4] In the Tenth Circuit, "claims based on a jail suicide are considered and treated as claims based on the failure of jail officials to provide medical care to those in their custody." *Barrie v. Grand Cty.*, 119 F.3d 862, 866 (10th Cir. 1997).

22

or officer of the PCCJC would violate the Decedent's federal constitutional rights by denying her access to adequate medical care. Additionally, Defendant Morris is entitled to qualified immunity with respect to Plaintiff's claims against him in his individual capacity. As discussed above, Plaintiff cannot demonstrate that it was clearly established that his alleged actions were a violation of federal constitutional rights, when considering the applicable law to the particularized facts of this case.

Respectfully submitted,

s/ Jamison C. Whitson
Wellon B. Poe, OBA No. 12440
Jamison C. Whitson, OBA No. 18490
Howard T. Morrow, OBA No. 32650
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK  73105
Telephone:      (405) 524-2070
Facsimile:      (405) 524-2078
Email:          wbp@czwlaw.com
                jcw@czwlaw.com
                htm@czwlaw.com

**ATTORNEYS FOR DEFENDANT CHRIS MORRIS, IN HIS INDIVIDUAL CAPACITY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 21, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

> Donald E. Smolen
> Jack W. Warren
> Smolen Law, PLLC
> 611 S. Detroit Avenue
> Tulsa, OK  74120
>
> ***Attorneys for Plaintiff***

s/ Jamison C. Whitson
Jamison C. Whitson
